*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0089p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————

SAEID B. AMINI,

 *Plaintiff-Appellant,*

 *v.*

OBERLIN COLLEGE,

 *Defendant-Appellee.*

No. 04-3420

>

———————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00274—Lesley Brooks Wells, District Judge.

Argued: June 7, 2005

Decided and Filed: March 10, 2006

Before: SILER and GIBBONS, Circuit Judges; LAWSON, District Judge.[*]

———————

**COUNSEL**

**ARGUED:** Saeid B. Amini, LAW OFFICE OF SAEID B. AMINI, Cleveland, Ohio, for Appellant.
Michael J. Frantz, FRANTZ WARD, Cleveland, Ohio, for Appellee. **ON BRIEF:** Saeid B. Amini,
LAW OFFICE OF SAEID B. AMINI, Cleveland, Ohio, for Appellant. Michael J. Frantz, Michael
N. Chesney, FRANTZ WARD, Cleveland, Ohio, for Appellee.

———————

**OPINION**

———————

 DAVID M. LAWSON, District Judge. For the second time, plaintiff Saeid B. Amini appeals
the dismissal of his civil rights lawsuit. Amini applied for a job as an assistant professor of
mathematics at defendant Oberlin College in 1998. He was not hired; in fact, he was not even
interviewed for the position. He responded to the rejection by filing a lawsuit in the district court
alleging discrimination on the basis of race, national origin, religious affiliation, and age under a
variety of federal statutes. The district court dismissed the complaint, and this court reversed in part,
remanding the racial discrimination count based on 42 U.S.C. § 1981 for further consideration.
Thereafter, the district court granted the defendant's motion for summary judgment on that
remaining count, which is the subject of the present appeal. We affirm.

———————

 [*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting
by designation.

1

I.

The plaintiff is an Iranian-born Muslim who has lived in the United States since 1977. He holds a bachelor of science degree in statistics and information science from the Iranian Institute of Statistics & Information Science, a masters of science degree in applied mathematics from the Massachusetts Institute of Technology, and a doctorate degree in statistics from the University of Iowa. While teaching at Case Western Reserve University, he earned masters of business administration and juris doctorate degrees. The plaintiff is admitted to practice law in New York, Florida, and Ohio. He taught over ten years and has an extensive record of publishing his work.

The defendant, Oberlin College, located in Oberlin, Ohio, purports to be an equal opportunity employer, engages in affirmative action hiring, and has a reputation for providing equal opportunities for minorities. In September 1998, Oberlin circulated in journals and on the Internet an advertisement for an assistant professor tenure-track position in the mathematics department to begin in the fall semester of 1999 and lasting a term of four years. The employment notice stated:

### COLLEGE OF ARTS & SCIENCES, OBERLIN COLLEGE

Assistant Professor of Mathematics

The Department of Mathematics at Oberlin College invites applications for a full-time, tenure-track faculty position in the College of Arts and Sciences. Appointment to this position will be for a term of four years, beginning Fall Semester 1999 and will carry the rank of Assistant Professor.

The incumbent will teach courses in the general area of undergraduate statistics and/or mathematics (5 courses/year). All research specialities in statistics and related fields will be considered. He or she will also be expected to participate in full range of faculty responsibilities, including supervising honors students, academic advising, service on committees, and sustained scholarly research and/or other creative work.

Among the qualifications required for appointment is the Ph.D. degree in Statistics or Mathematics (in hand or expected by August 31, 1999). Candidates must demonstrate interest and potential excellence in undergraduate teaching. Successful teaching experience at the college level is desirable.

To be assured of consideration, letters of application, including a *curriculum vitae*, graduate and undergraduate academic transcripts, and at least three letters of reference, should be sent to Jeffrey Witmer, Professor of Mathematics, Department of Mathematics, Oberlin College, Oberlin, Ohio, 44074, by November 15, 1998. Application materials received after that date may be considered until the position is filled. Salary will depend on qualifications and experience. Oberlin College has admitted women since its founding in 1833 and has been historically a leader in the education of blacks. The Mathematics Department has a strong record of producing students who earn Ph.D. degrees in the mathematical sciences.

September 18, 1998

AFFIRMATIVE ACTION, EQUAL OPPORTUNITY EMPLOYER

J.A. at 206. Department Chairman Michael Henle and Professors of Mathematics Jeffrey Witmer and Robert Bosch formed an informal recruiting and hiring committee for the position.

Amini was unemployed at the time and applied for the position, submitting a cover letter dated October 9, 1998, a short resume, and a version of his full curriculum vitae. The cover letter described the highlights of his teaching experience, awards, and his multidisciplinary work experience, and it disclosed that Case Western Reserve University denied him a tenure position with its medical school. Oberlin sent a letter dated October 14, 1998 informing Amini that his application lacked educational transcripts and three letters of reference. In response, Amini supplemented his application with three letters of reference and one transcript along with a cover letter dated November 23, 1998 offering to provide additional information upon request. The recommendation letters related to the appellant's applications for tenure with Case Western Reserve University and were dated May 14, 1992, May 15, 1995, and September 26, 1996. Oberlin apparently considered the letters deserving of less weight because the applicant sent them unsealed, so they were not "confidential." Oberlin did not pursue the plaintiff's invitation to request additional materials.

Dr. Chris Andrews, the ultimately successful candidate and a former Oberlin College student, contacted Dr. Henle in October of 1998 to demonstrate interest in applying for the open position and to request a letter of recommendation. Dr. Henle already had written a letter of recommendation for Dr. Andrews in connection with a position at another academic institution. Andrews had received a bachelor of arts degree in mathematics from Oberlin College, a masters degree in mathematics from the University of California at Berkeley, and a doctorate in statistics from Carnegie Mellon University. He had experience teaching at Oberlin College with the texts utilized by the Mathematics department. Completion of a National Science Foundation post-doctoral fellowship distinguished him from his peers. The father of Dr. Andrews had taught as a statistician at Oberlin until taking a position as the college's director of athletics, which created the vacancy for a statistics professor. At the time Dr. Andrews applied for his father's position at Oberlin, he taught at Lafayette College and had not yet completed one semester there.

Dr. Henle added to Dr. Andrews' application file by providing a letter of recommendation. He also testified that he was concerned about complications that Dr. Andrews' application created for the department. He explained:

Q. When he called you, did you in fact encourage him to apply?
A. No. I was, in fact, not particularly happy he applied.
Q. Why not?
A. Because of the – because he had been a student here, his father had taught here. It just created a more complicated situation around his application, around the normal application. . . .
A. . . . He has outstanding qualifications, in my view. It's just the other issues that involved his application that made me less than pleased that he was applying.

J.A. at 110-11. Henle did not clearly make his feelings known to other professors involved in the hiring decision. He testified:

Q. But you never objected to that in any way?
A. No. I had no right to do that.
Q. Okay. At least in making your concern known to other members of the department?
A. I don't know that we had much discussion of this issue. I mean – I may just have grumbled about it.

J.A. at 111.

Dr. Witmer received ninety-six applications prior to the application deadline. The application of an Hispanic female received his attention, shown by underlining on a letter

recommending her. The letter, which is reproduced here with Dr. Witmer's underlining, reads as follows:

> Ms. Eleanne Solorzano, who is applying for a position in your department, has requested that I provide a letter of recommendation on her behalf. I am delighted to do so. . . She has <u>a solid background in applied and theoretical statistics</u>. She has also received training in statistical consulting and statistical computing. She has been <u>a very good student</u>. . . . Eleanne's dissertation is in the area of multiple comparisons. . . . <u>Her work extends Dunnett's landmark work for comparing treatments with on control</u>. . . .Her research is going well and I anticipate no difficulty with her completing the dissertation in time for an August 1999 graduation. <u>We have one paper from the dissertation tentatively accepted in the Journal of Statistical Computation and Simulation</u>. I <u>anticipate that three other publications will result</u> from her dissertation. Eleanne enjoys research and <u>should be a successful independent researcher</u>. Eleanne also enjoys teaching. . . . The most recent student evaluation of her teaching revealed that <u>13 students rated her as excellent, 19 as very good, and 3 as good, 0 as fair</u>, and 0 as poor. . . . I have not observed Eleanne as a statistical consultant. However, the combination of her experience as a consultant, her consulting training in our department, and her excellent teamwork skills suggest that she has potential in this area. On the personal side, <u>Eleanne is a pleasant Hispanic lady, who interacts well with others</u>. . . . Though born in Nicaragua, she has been in this country a long time and fits completely into our culture. She is a U.S. citizen. <u>Her spoken and written English are excellent</u>.

J.A. at 240-41.

The applicant pool contained eight applicants with names common among Middle-Easterners and other non-Caucasian races: Hamid Behmard, Alireza Ranjbar Motlagh, Kamel Rekab, Yanguang Li, Maziar Quliaeinia, Golam Kibria, Khaled Hussein, and Ahmed Mohd Abdalla Hamdi.

The informal hiring committee narrowed the field of applicants to six for final consideration by the whole mathematics department. Andrews remained under consideration; the plaintiff did not. Dr. Henle represented in an affidavit that the committee eliminated Dr. Amini from consideration because "he had recently been denied tenure at Case Western Reserve University" and "he submitted out-dated, non-confidential letters of reference." J.A. at 88. In fact, one letter the plaintiff submitted indicated some concern for his performance, stating "the committee believes that Dr. Amini, clearly an imaginative person when it comes to statistical methodology, [should] be encouraged to devote a little more of his unusual energy to contributions." J.A. at 225. Witmer and Bosch averred that they did not recall reviewing the plaintiff's application but stated that applicants were rejected based on their relative qualifications for the position, and the race of the applicant was not a consideration.

The department then met, discussed the six finalists, provided each member an opportunity to comment on the applicants, and selected two candidates by consensus to interview for the position: Joy Jordan and Dr. Chris Andrews. Jordan had not yet received her doctorate degree but expected to graduate in time to fill the position.

On December 7, 1998, Dr. Henle extended an interview invitation to Dr. Andrews. He also requested teaching evaluations from Andrews' then-current position. Henle eventually obtained the evaluations directly from Lafayette College. He did not ask any other applicant to provide such evaluations, but Dr. Witmer obtained similar information about Jordan by contacting professors at the University of Iowa, where she taught. Jordan interviewed on December 14, 1998; Andrews had his turn three days later. Andrews met with each member of the mathematics department hiring committee and other members of the Oberlin faculty, totaling about eleven individuals in all over

the course of the day. The full mathematics department met within a day or two of the Andrews interview and decided by consensus to extend an offer to Dr. Andrews. Henle, Witmer, and Bosch stated that the hiring committee and the department considered him to be the candidate most likely to succeed as a teacher of undergraduate students and researcher in the field of statistics.

On January 31, 2000, the plaintiff filed a three-count complaint against Oberlin College alleging racial, national origin, and religious discrimination in violation of 42 U.S.C. § 2000e (Count 1) and 42 U.S.C. § 1981 (Count 2), and age discrimination in violation of 29 U.S.C. § 621 *et seq.* (Count 3). The district court granted Oberlin's motion to dismiss all of the claims on April 14, 2000. On the first appeal, this court reversed in part and remanded the race discrimination claim under section 1981 for further proceedings. The complaint referenced an attached EEOC charge that alleged "I believe I was discriminated against because of my race, Middle Eastern, national origin, Iranian, and religion, Muslim, in violation of Title VII of the Civil Rights Act of 1964, as amended and my age, 45, in violation of the Age Discrimination in Employment Act." This court concluded that the reference was sufficient to survive a Rule 12 motion. *Amini v. Oberlin College*, 259 F.3d 493, 503 (6th Cir. 2001).

Discovery was conducted, and on October 1, 2002, Oberlin filed a motion for summary judgment on the remaining claim. The district court granted the motion, and the plaintiff now appeals that judgment, arguing that he has submitted evidence demonstrating a genuine issue of material fact on his claim, and the district court erred by not considering the evidence in the light most favorable to him. Amini focuses his arguments on the contention that the district court failed to properly consider that the preferential treatment enjoyed by Dr. Andrews demonstrates direct evidence of discrimination and indirect evidence that the non-discriminatory reasons for the challenged action are pretextual. Oberlin counters that the district court correctly granted its motion for summary judgment but contends the plaintiff did not demonstrate a *prima facie* case of discrimination.

## II.

This court reviews a district court's grant of summary judgment *de novo* and applies the same standard as the district court. *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party can meet its burden under Rule 56(c) by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see Estate of Mauro By and Through Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 401 (6th Cir.1998). Once the moving party has made that showing, the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex*, 477 U.S. at 324; *Hall v. Tollett*, 128 F.3d 418, 421-22 (6th Cir. 1997).

The court must view the evidence in the light most favorable to the nonmoving party. However, the party opposing the summary judgment motion must "do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Title 42, section 1981 of the United States Code provides:

(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

The statute prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001). The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Oberlin, as an academic institution, is "subject" to the requirements of the statute. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987).

In order to establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a). *See Christian*, 252 F.3d at 871-72. As the district court observed, the "intent" element of the claim can be established either by direct evidence or inferentially. *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985) (explaining that the direct and circumstantial means of proof are two "different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent"). When a claimant seeks to prove intentional discrimination inferentially in a section 1981 case, federal courts follow the burden-shifting framework that the Supreme Court has prescribed for analogous civil rights cases described in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *overruled on other grounds by* Pub. L. 102-166, § 101 (noting that "this scheme of proof, structured as a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination . . . should apply to claims of racial discrimination under § 1981") (internal quotes and citation omitted); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (holding that "[t]he elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981") (*quoting Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) .

The parties agree that the plaintiff presented sufficient evidence on the first and third elements to survive a motion for summary judgment, and the district court so held. The question presented for resolution centers on the defendant's motivation for including the plaintiff among the ninety applicants who were eliminated in the first round, that is, whether the plaintiff's race played a role in the decision not to include him as one of the six finalists or, ultimately, not to hire him. The

plaintiff contends on appeal that the record contains direct evidence of discriminatory intent on the defendant's part, and he repeats the same arguments he made in the district court: that the college never hired an African-American or Mid-Eastern faculty member; Dr. Witmer, the chair of the search committee, did not recall reviewing an application from any candidate "other than a non-European White"; the college hired a non-white faculty member after the plaintiff filed his complaint with the EEOC; and the successful candidate, Dr. Christopher Andrews, was given favorable and preferential treatment, all constitute direct evidence that the defendant intended to discriminate against the plaintiff on account of his race.

The district court dispatched this argument in short order, with good reason. The plaintiff has misconstrued the nature of direct evidence. As this court has explained many times, "[d]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005). It does not require the fact finder to draw any inferences to reach that conclusion. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). For example, proof of "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to [avoid hiring] employees in the protected group is direct evidence of discriminatory intent." *Ibid.*; *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed.

We agree with the district court's conclusion that the evidence cited by the plaintiff does not amount to direct evidence of discrimination. The racial composition of the Oberlin faculty does not lead ineluctably to the conclusion that the college considered race when eliminating the plaintiff from consideration for the position for which he applied. Such statistical evidence at most may constitute circumstantial evidence of discrimination. *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990). However, "[f]or statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Rocha v. Great Am. Ins. Co.*, 850 F.2d 1095, 1101 (6th Cir. 1988) (internal quotes and citation omitted). The plaintiff's evidence constituted at most an anecdotal report; both parties provided some evidence of Oberlin's hiring practices and the college stated that it had hired faculty members with Iranian, Algerian, Sri Lankan, and Asian lineage. The plaintiff did not develop this evidence into useful direct or inferential proof of the defendant's intent.

The other evidence cited by the plaintiff does not require a conclusion of unlawful discrimination, either. Dr. Witmer's lack of memory of the field of applicants and Dr. Henle's preference for Dr. Andrews, whom he had known personally through his undergraduate tenure at Oberlin, does not establish a discriminatory animus. Finally, Oberlin's hiring activity occurring around the time of the plaintiff's EEOC filing does not show that the college rejected the plaintiff's application because of his Mid-Eastern race.

The district court also considered whether the plaintiff offered sufficient circumstantial proof of the defendant's discriminatory intent by applying the familiar burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must present a *prima facie* case, at which point the defendant must come forward with a legitimate, non-discriminatory reason for its action. If the defendant can respond with such a reason for the adverse employment action, the plaintiff has the burden of offering evidence that the defendant's justification is a pretext that masks its true discriminatory intent. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Throughout the analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The district court held that the plaintiff made out a *prima facie* case, and the defendant's assertion that it eliminated Dr. Amini's application because he was not one of the most qualified candidates and Dr. Andrews was the most likely to succeed in the position were legitimate, non-discriminatory reasons for its action. On appeal, the plaintiff insists that the record contains issues of fact whether Oberlin's justification for its hiring decision was a pretext for discrimination, a point decisively rejected by the district court.

A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson*, 319 F.3d at 866. Amini's arguments fall into the first two categories. First, he argues that Oberlin's claim that Dr. Andrews is "the individual most likely to succeed as a teacher and researcher at the college" is insufficient to demonstrate a nondiscriminatory reason for hiring, because any employer could use that reason to justify a discriminatory action. Second, he contends that the college is not entitled to deference in deciding who receives offers for teaching positions because such deference only extends to circumstances of faculty promotion and award of tenure and would contradict the purposes of section 1981 by allowing educational institutions to engage in discriminatory hiring and promotion. Third, he maintains that he has superior qualifications than the other applicants, and Dr. Andrews' credentials cannot stand up to his, nor could Andrews have gotten the job without preferential treatment. Moreover, he says, there is evidence that the hiring committee was race conscious in that Oberlin's hiring agents could not recall reviewing applications of candidates with Middle-Eastern-sounding names, they interviewed three non-European white persons and hired a person of his race after he filed his lawsuit, and a professor reviewing the application of a Central-American woman underlined the statement "Eleanne is a pleasant Hispanic Lady," J.A. at 241.

The district court carefully considered each of these claims and concluded that they do not amount to pretext masking discriminatory animus. The plaintiff contends that the district court's reasoning constituted impermissible fact finding at the summary judgment stage, but we do not agree. Rather, we conclude that the plaintiff's evidence trenches not at all upon the defendant's conclusion that Dr. Andrews was preferred as a candidate for nondiscriminatory reasons. The plaintiff has great difficulty accepting the fact that the hiring committee found a younger, less experienced, less published person more likely to succeed in the position than himself, and concludes that some other reason must support the decision than merit alone. The evidence does show that Dr. Andrews had personal and family connections to the college, but hiring decisions based on those reasons are not illegal. *See Goostree v. State of Tennessee*, 796 F.2d 854, 862 (6th Cir. 1986) (stressing "the difference between a hiring process that proceeds based on legally impermissible distinctions between candidates and a 'patronage system that relies on family, friends, and political allies'"). Dr. Henle was Andrews' academic advisor during Andrews' undergraduate studies at Oberlin, so there is nothing sinister in Andrews turning to Henle for a letter of recommendation. The plaintiff misconstrues the evidence when he argues that Henle invited Andrews to apply for the job; the testimony indicates that Dr. Andrews contacted Dr. Henle about the position. *See* J.A. at 110-11. There is no suggestion in the record that Oberlin's decision to weed out the plaintiff's application in the initial stage of the search was based at all on his "race." The district court properly determined that Dr. Amini had a blemished background and, even if more qualified, he had not proven his qualifications with a complete application.

We also believe that the district court properly rejected the plaintiff's argument that underlining on the application of the Hispanic female demonstrated racial animus. The reviewer did underline the phrase "Eleanne is a pleasant Hispanic lady." However, this evidence does not demonstrate a focus on her ethnicity when considered in context. The full phrase underlined relates to the applicant's ability to work well with others, "Eleanne is a pleasant Hispanic lady, who interacts well with others." J.A. at 241. Other underlining highlighted her strengths, "a solid background in applied and theoretical statistics," "a very good student," "should be a successful

independent researcher," and "13 students rated her as excellent, 19 as very good, 0 as fair," demonstrating the reviewer's interest in her qualifications for the position, not her ethnicity.  J.A. at 240-41.

We agree with the district court that a reasonable jury would not have been able to coax an inference of illegal discrimination from the evidence put forth by the plaintiff.  There was no material fact issue presented by the record that required a trial for resolution.  Summary judgment was the proper procedure for disposing of the issues presented in the district court.

III.

Because we agree that the issues presented for decision were correctly determined, we **AFFIRM** the judgment of the district court.