NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0055n.06
Filed: January 26, 2009

No. 07-4352

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **EDWIN I. EJIKEME**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| **DON VIOLET**, c/o State of Ohio, Department of | ) | **O P I N I O N** |
| Transportation; **STATE OF OHIO** | ) | |
| **DEPARTMENT OF TRANSPORTATION**, | ) | |
| | ) | |
| *Defendants-Appellants*. | ) | |

BEFORE:    COLE, GIBBONS, Circuit Judges; BELL, District Judge.[*]

**COLE, Circuit Judge**. Plaintiff-Appellant Edwin I. Ejikeme brought this action against his former employer, the State of Ohio Department of Transportation ("ODOT") and his former supervisor, Donald Violet. Ejikeme alleges that he was discriminated against on the basis of race, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981 and 1983. Ejikeme also claims that he was retaliated against for reporting suspected fraud in violation of the First Amendment and that he was constructively discharged. The district court granted summary judgment in favor of ODOT and Violet. For the following reasons, we **AFFIRM**.

_____

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

## I. BACKGROUND

### A.    Factual Background

Ejikeme was born in Nigeria and came to the United States at the age of eighteen or nineteen to attend college.  After obtaining a degree in civil engineering, he began working for ODOT in 1990, initially as an engineer intern, and later as a permanent engineer.

Although the events at issue in this lawsuit occurred primarily between 2001 and 2004, Ejikeme had friction with his supervisors throughout his employment at ODOT.  For example, Ejikeme "think[s] he remembers[s]" one of his first supervisors doing "something like" ordering another employee to shoot Ejikeme in the leg.  (Joint Appendix ("JA") 12a-22.)  In 1994, Ejikeme claims that another employee attempted to run him over with a truck.  In 1992 or 1993, Ejikeme sued ODOT in federal court for racially discriminatory failure to promote, and the case was settled in 1997.  From 1995 to 2001, Ejikeme worked under the supervision of Ron Mayo, apparently without incident.

Beginning in 2001, Ejikeme's supervisor was Faour Alfaour.  At that time, Defendant Don Violet was Alfaour's supervisor.  Ejikeme and Alfaour did not get along well.  In 2002, Ejikeme filed an internal complaint against Alfaour for "Supervisory Intimidation."  The complaint dealt with Alfaour's management style generally and included specific complaints about, among other things, requests by Alfaour for Ejikeme to do tasks without following proper procedures and Alfaour's attempts to discuss Ejikeme's complaints with him outside the presence of a union representative. After Ejikeme lodged his complaint, he alleges that Alfaour sent an email to the ODOT labor relations officer for their district criticizing Ejikeme.  Ejikeme claims that the criticisms were

"racially motivated," though, as Ejikeme recounts them in his Amended Complaint, they contain no mention of race and appear to relate only to Ejikeme's work ability and to the nature of his internal complaint, which Alfaour called "stupid" and "childish." Ejikeme also alleges that Alfaour referred to him as a "monkey" in a conversation with a contractor. In 2002, as a result of his complaint about Alfaour, Ejikeme was transferred to Violet's supervision.

### a. Allegedly discriminatory acts by Violet

Violet, who is Caucasian, was a Transportation Engineer 4 and Area Engineer in Construction for ODOT's District Six. Ejikeme alleges several ways in which Violet exhibited racial, religious, and national origin bias against him. First, Ejikeme claims that Violet failed to represent fairly the dispute between Ejikeme and Alfaour when describing it to an ODOT manager. Second, Ejikeme claims that Violet "exhibited racial and national origin bias" when he requested that Ejikeme be disciplined for his failure to respond to Violet's question about an incident involving Ejikeme's assigned state car. (JA 6b-9.) Third, Violet threatened to discipline Ejikeme if he continued to change his computer password, contrary to Violet's instructions. Fourth, for reasons not explained in the record, Violet told Ejikeme he was "disgusting" and said that everyone in the district thought he was disgusting. Fifth, Ejikeme claims that Violet, while on the telephone in the district office, said "[I'm] here with a horse," when the only other person in the office was Ejikeme. (JA 12a-80.) Sixth, in 2001 or 2002 when Ejikeme was still under Alfaour's supervision, Ejikeme stated to Violet that he worked for Jesus, and Violet replied, "No, you work for Faour [Alfaour]." (*Id*. 187.)

3

### b. *Ejikeme's report of fraud; ODOT's investigation*

A central part of Ejikeme's job in 2004 was inputting ODOT inspectors' reports into a computer system. At some point in early 2004, Ejikeme came to believe that duplicate reports were being submitted, resulting in overpayments to contractors. In the spring of 2004, Ejikeme told Violet that his Christian religious beliefs prevented him from participating in the falsification of documents. Ejikeme testified in his deposition that he always considered himself a Christian, but that in about 1998, he became a born-again Christian. Ejikeme also told Violet, "[t]he work that you're giving me does not make sense. I'm seeing double numbers." (JA 12a-58.) Violet allegedly responded, "[p]ut in whatever they give you," and that Violet was not concerned because it was not Violet's money. (*Id*. 59.) Based on this, Ejikeme concluded that "Don Violet [was] paying contractor[s] more than once for work on the same location." (*Id*. 106.)

Ejikeme reported his suspicions to his union representative who put him in contact with Mark Young, an ODOT investigator. Young met with Ejikeme the following day and again about two weeks later. Ejikeme gave Young a lengthy statement about the suspected fraud. Neither in the interview, nor anywhere else, did Ejikeme connect his suspicion of fraud with his claims of Title VII violations. He further stated that there was no animosity between himself and Violet. Ejikeme also claims that after his initial report to Young, Violet asked him to place a forged document into a file and to open a new account for a project for which an account already existed.

Young conducted an investigation in response to Ejikeme's report, and the investigation revealed a considerable number of discrepancies and flaws in the relevant records but no indication of fraud. What Ejikeme perceived as double-payments was apparently the result of a practice of the

two project inspectors each completing daily inspections forms, sometimes covering the same projects—while this led to confusion, it did not lead to fraudulent payments. Violet was disciplined for failure adequately to supervise the data entry and documentation compliance aspects of the project flagged by Ejikeme.

Ejikeme requested a second interview with Young to tell him that he had discovered several months previously that he was being spied on by unknown people. Ejikeme explained that he had forgotten to mention these fears at his initial interview with Young. Ejikeme claimed that remarks made by an outside consultant at an ODOT training session in June of 2004 revealed that someone was spying on him at home. The remarks, while not referring to Ejikeme specifically, described certain intimate personal habits that applied to him, leading him to believe that someone had been spying on him at his home. At a training session in July of 2004, Ejikeme claims that an unknown person played a recording of his daughter's voice on the telephone. Ejikeme asked Young to "help [him] find who is denying [him his] privacy at home and who is trying to frame [him]." (JA 19a-26.) In response to Young's questions, Ejikeme was unable to provide any more information about the alleged threats. Ejikeme never reported his fear that he was being spied on to the police.

Ejikeme voluntarily resigned in October of 2004, later claiming that he was constructively discharged as a result of his hostile work environment.

**B.    Procedural Background**

Plaintiff brought this action pro se. After discovery, ODOT and Violet moved for summary judgment, and the district court granted their motion. With respect to Ejikeme's hostile work environment claim, the court found that he failed to present sufficient evidence of an objectively

hostile environment to establish a prima facie case. In particular, the court found no objective connection between the comments and offenses Ejikeme claimed to have suffered and his race, religion, or national origin. Even if Ejikeme had established a hostile work environment, the district court found that no basis would have existed for holding ODOT liable. The court also found a lack of evidence to support Ejikeme's constructive discharge claim.

With respect to Ejikeme's § 1981 and § 1983 claims, the district court held that ODOT was immune from suit under the Eleventh Amendment. With respect to Ejikeme's § 1981 claim against Violet, the court held that Ejikeme had failed to come forward with any evidence of intentional discrimination on the basis of race. The court interpreted Ejikeme's pleadings to be claiming retaliation in response to constitutionally protected speech. The court found that Ejikeme had failed to offer proof of any adverse action motivated by his alleged exercise of his constitutional rights.

Plaintiff timely appealed and is now represented by counsel.

## II. ANALYSIS

### A. Standard of review

We review a grant of summary judgment de novo. *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th

Cir. 2006). Summary judgment is not appropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 251-52.

**B.     Title VII hostile work environment**

Title VII offers employees protection from a "workplace [] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). To prevail on a hostile work environment claim, a plaintiff must show that his work environment was both objectively and subjectively hostile. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Id.* at 21-22; *see also Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999).

To evaluate an alleged hostile work environment, we look at the totality of the circumstances. *Harris*, 510 U.S. at 23; *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). We consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir. 1999). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Under Title VII, a plaintiff establishes a prima facie case of a hostile work environment based on race, religion, or national origin by demonstrating that (1) she was a member of a protected class;

7

(2) she was subjected to unwelcome harassment; (3) the harassment was based on race, religion, or national origin; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *see also Bourini v. Bridgestone/Firestone N. Am. Tire, L.L.C.*, 136 F. App'x 747, 750 (6th Cir. 2005) (prima facie elements are the same for claims of racial and religious discrimination).

In our view, the district court correctly concluded that Ejikeme was unable to establish a prima facie case of a hostile work environment. Ejikeme was subjected only to a few scattered comments over several years, almost all of which had no apparent connection to his race, religion, or national origin. Ejikeme claims that Alfaour called him a "monkey" and that Violet called him a "horse" and said he was "disgusting." He also points to several instances in which he was disciplined or threatened with discipline for reasons that appear, based on the record, to have been valid. The record does not provide reason to believe that these comments and actions were motivated by impermissible bias. However, even if they were racially motivated, as Ejikeme perceived them to be, they fall short of creating an objectively hostile work environment for purposes of Title VII.[1]

---

[1]The district court did not err in finding that the alleged instruction by Ejikeme's supervisor to shoot him in 1992 and Ejikeme's co-worker's alleged attempt to run him over with a truck in 1995 were not sufficiently related to his other hostile work environment allegations to form one continuous hostile work environment and were thus untimely. *See, e.g.*, *Wheaton v. N. Oakland Med. Ctr.*, 130 F. App'x 773 (6th Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002) (holding that "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice")). In addition, it appears that Ejikeme did not report either of these incidents to ODOT

Ejikeme devotes a portion of his brief to arguing that Young's investigation uncovered more serious discrepancies than the district court acknowledged. However, this is irrelevant to Ejikeme's hostile work environment claim as the allegations of fraud bear no relation to Ejikeme's claims of harassment based on his membership in protected groups. Ejikeme attempts to tie the alleged fraud to his allegations of religious discrimination by claiming that he was asked to engage in dishonest conduct that his religion did not permit. However, he cites no case law supporting his claim that a request to engage in alleged fraud can support a claim of religious discrimination for purposes of Title VII.

Furthermore, the district court correctly found that Ejikeme's claim fails on the issue of ODOT's liability. First, with respect to conduct by co-workers, ODOT was not directly liable because there was no evidence that ODOT "knew or should have known of the [harassing] conduct, and that its response manifested indifference or unreasonableness." *Jackson v. Quanex*, 191 F.3d at 663. On the contrary, to the extent that Ejikeme made such complaints, ODOT's responses manifested serious concern. Second, when the alleged harasser is a supervisor, as was Violet, the employer may be held vicariously liable but may assert an affirmative defense to a hostile work environment claim (as long as no tangible employment action has been taken against the employee) if (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the employee failed unreasonably to take advantage of preventive or corrective opportunities provided by the employer. *See Faragher*, 524 U.S. at 807. Given that ODOT responded promptly

_____

or anyone else, such as the police.

to Ejikeme's complaints, that Ejikeme was well-aware of the complaint mechanisms in place at

ODOT, and that Ejikeme failed to complain of racial, religious, or national origin discrimination

prior to this lawsuit, there is no genuine issue of material fact as to whether ODOT established its

affirmative defense to liability for Violet's acts. *See, e.g.*, *Thornton v. Fed. Express Corp.*, 530 F.3d

451, 457-58 (6th Cir. 2008) (granting summary judgment to employer that established affirmative

defense as to liability).

## C.     Constructive discharge

To demonstrate constructive discharge, Ejikeme must adduce evidence that 1) "the employer

. . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and

2) the employer did so "with the intention of forcing the employee to quit . . . ." *Moore v. Kuka*

*Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). In our inquiry into the first prong of this test,

> we consider the following factors relevant, singly or in combination: (1) demotion;
> (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to
> menial or degrading work; (5) reassignment to work under a younger supervisor; (6)
> badgering, harassment, or humiliation by the employer calculated to encourage the
> employee's resignation; or (7) offers of early retirement or continued employment on
> terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting and adopting *Brown v. Bunge Corp.*,

207 F.3d 776, 782 (5th Cir. 2000)).

Ejikeme has not adduced evidence that would allow a reasonable jury to conclude that

intolerable working conditions existed when he voluntarily left his position. Of the above-mentioned

factors, he has asserted only a general claim that between September 10, 2004 and September 21,

2004, Violet made more unannounced visits than usual to the office where Ejikeme and "exhibit[ed]

10

anger and at one point called Mr. Ejikeme a horse." (JA 6b-7.) Ejikeme also claims that he feared that unidentified persons involved in the "fraud" he uncovered might try to kill him, but he has offered no evidence in support of this subjective fear. Nor has he provided evidence in support of his fears that unknown people from ODOT were spying on his home. Ejikeme has failed to raise a genuine issue of material fact as to whether he was constructively discharged.

**D.      Section 1981 and 1983 claims**

The district court correctly concluded that ODOT, as an arm of the state of Ohio, is shielded by the Eleventh Amendment from Ejikeme's § 1981 and § 1983 claims. *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 654 n.8 (6th Cir. 2007); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). Ejikeme does not challenge this ruling.

As to defendant Violet, summary judgment dismissing Ejikeme's § 1983 free speech retaliation claim was proper because Ejikeme did not offer evidence that he suffered an adverse action as a result of his allegedly protected speech. To establish a prima facie case for free speech retaliation, a plaintiff must show (1) that he engaged in constitutionally protected free speech, (2) that he was subjected to an adverse action or deprived of a benefit, and (3) that the adverse action was motivated at least in part by the exercise of the protected speech. *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). We need not reach the question of whether Ejikeme's speech was protected because he has failed to show that he suffered any adverse action as a consequence of that speech. Ejikeme voluntarily left his position at ODOT, and he was not constructively discharged. Ejikeme stated that he "could have been killed" by "anyone . . . that is involved in this fraud" if he had remained at his job. (JA 12a-189.) However, he offers no objective evidence of any threat

against him or any other explanation for his subjective fear. No reasonable jury could find based on the evidence in this record that Ejikeme suffered an adverse action "that would likely chill a person of ordinary firmness from continuing to engage" in exercising his free speech. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

The district court also properly granted summary judgment on Ejikeme's § 1981 claim because Ejikeme failed to adduce evidence that Violet intentionally discriminated against him on the basis of race. To establish a claim for racial discrimination under § 1981, a plaintiff must show (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in § 1981(a). *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). Ejikeme has adduced no direct evidence that Violet intentionally discriminated against him on the basis of his race. To the extent that Ejikeme attempts to prove by indirect evidence that Violet subjected him to a racially hostile work environment, his claim fails for the same reasons as his Title VII claim. *See Quinn-Hunt v. Bennett Enters.*, 211 F. App'x 452, 456 (6th Cir. 2006) (same burden-shifting analysis applies to claims under Title VII and § 1991).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to ODOT and Violet.