**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 14a0473n.06

Case No. 13-4382

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARY HELFRICH, | ) | |
| | ) | |
|    Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| NORTHWEST OHIO ORTHOPEDICS & | ) | OHIO |
| SPORTS MEDICINE, INC., | ) | |
| | ) | |
|    Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SUTTON and COOK, Circuit Judges; MARBLEY, District Judge[*]

COOK, Circuit Judge. Plaintiff Mary Helfrich appeals the district court's grant of summary judgment to her former employer, Northwest Ohio Orthopedics & Sports Medicine, Inc. ("Northwest"), on her unlawful discharge claim under the Age Discrimination in Employment Act (ADEA). *See* 29 U.S.C. § 623(a)(1). We AFFIRM.

I.

Helfrich came to Northwest as a temporary employee in December 2007, obtaining full-time employment in the medical records department the following August. She was 58 at the

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

time of hire. Everything apparently went smoothly until Shelly Neeley became Helfrich's supervisor in the fall of 2010. Despite the continued growth of Northwest's business, Helfrich and Neeley remained the only full-time employees in the records department (previously staffed with four), and Helfrich's performance reviews began to suffer.

In January 2011, Neeley and head administrator Paula Miller met with Helfrich to discuss "ongoing performance problems . . . rang[ing] from managing medical records, to timely completing the scanning and uploading of patient information, to ensuring that one patient's medical information did not end up in another patient's charts." (R. 16-1, Miller Decl. ¶ 4.) Miller and Neeley prepared a list of fifteen specific grievances for Helfrich. (*Id.* & Ex. A.) Then, between February and mid-April 2011, Neeley notified Helfrich on at least three occasions of incomplete work, including a misfiled surgery photograph and unprocessed dictation. (R. 16-2, Neeley Decl. ¶¶ 4–6; *id.* Exs. A–C (emails documenting problems).) According to Neeley:

> [Helfrich] often fell behind in her work and had problems with accuracy, such as putting one patient's records in another patient's files. Occasionally I would do the work that Helfrich should have done herself. Other times, I would talk with Helfrich about how she could improve her performance. Sometimes she would improve her performance for a short period of time, but then her performance would always taper off again.

(*Id.* ¶ 2.)

Helfrich received a 30-day warning on April 29, 2011, for "substandard work quality" and "carelessness." (R. 17-1, Helfrich Dep. Ex. 3.) Though Neeley ultimately found many of the cited performance problems "negated," "there were enough things prior to [the 30-day warning]" that prevented Neeley and Miller from rescinding the warning. (R. 26, Neeley Dep. at 154–56.) After meeting with Neeley and Miller to discuss her work deficiencies, Helfrich spent the following Saturday at the office with Neeley catching up on work. In contemporaneous

email exchanges with Neeley, Helfrich predicted that Miller would fire her, writing "She can't keep me—it would prove her wrong & management does not do that." Though Helfrich successfully completed her 30-day work-improvement plan, problems persisted throughout that evaluation month.

On May 2, Neeley met with Helfrich to discuss her backlog of scanning assignments and her handling of external records requests; follow-up emails memorialized the conversation and reminded Helfrich to keep up on scanning and other assignments. (R. 16-2, Neeley Decl. ¶¶ 6–7; *id.* Exs. D–E; R. 17-1, Helfrich Dep. Ex. 19.) On May 17, Neeley assigned Helfrich a time-sensitive scanning project, only to do the job herself when Helfrich failed to address it before the close of business. (R. 16-2, Neeley Decl. ¶ 8; *see also id.* Ex. F.) Three days later, Miller met with Helfrich to discuss remaining performance issues and prepared an assignments checklist. (R. 16-1, Miller Decl. ¶ 5 & Ex. B.)

Helfrich's performance issues continued even after that conversation. In July, Miller and Neeley confronted Helfrich about working unapproved overtime during her lunch breaks. (*Id.* ¶ 6 & Ex. C.) Then, on September 8, Northwest received a patient complaint after Helfrich failed to process external records requests properly. (R. 16-2, Neeley Decl. ¶ 10; *see also id.* Ex. H.) The patient complaint followed closely on the heels of Helfrich sending Miller and Neeley a blunt email criticizing their management style and anticipating her ultimate termination. (R. 17-1, Helfrich Dep. Ex. 24.) Northwest fired Helfrich on September 15 and reassigned Claudia Azaroff, an employee in her late twenties, to perform her duties in the records department.

Helfrich filed suit under the ADEA, alleging that Northwest discriminated against her because of her age. To support this claim, Helfrich pointed to Northwest's firing of five other

employees protected by the ADEA, its disparate treatment of her and Azaroff's performance problems, its intentional understaffing of the records department, and ageist remarks by a colleague. The district court granted Northwest's motion for summary judgment in a thorough opinion and order, finding that, although Helfrich presented a prima facie case of discrimination, she failed to present evidence of pretext necessary to overcome Northwest's performance-based justification for her firing. Helfrich appeals.

## II.

On appeal, Helfrich renews her pretext arguments, asserting that the district court failed to draw reasonable inferences in her favor. Giving the matter fresh review under the familiar summary judgment standard, *see Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012), we agree with the district court that Helfrich failed to show pretext.

Appellant challenges Northwest's poor-performance explanation for her firing under our three traditional pretext models, arguing that it: (1) has "no basis in fact"; (2) did not actually cause her termination; and (3) could not justify her termination, in light of Northwest's preferential treatment of Azaroff. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014). Her evidence supports none of these.

With regard to her factual-basis challenge, Helfrich stresses that the April 2011 30-day warning served as her only disciplinary action, and that Neeley admitted the falsity of the warning's grievances. True enough, Neeley conceded that, as of the 30-day warning, "most" of the performance objections "were negated," and "some of the things . . . never happened." (*See* R. 26, Neeley Dep. at 152.) But, when asked whether she did something to modify the warning, she testified that "there were enough things prior to [the 30-day warning]" that prevented her and

head administrator Miller from rescinding the warning. (*Id.* at 154; *see also id.* at 156 (explaining that Miller decided to issue the warning, notwithstanding the negated claims, "because there were so many things that were already justifying this action prior to when [it] took place").) Furthermore, Neeley and Miller identified at least four occasions, after the April warning, when they needed to confront Helfrich about performance problems, ranging from delinquent assignments to unapproved overtime. Helfrich offers no evidence disputing these complaints. And though she downplays the emails documenting these meetings as routine employee coaching, they speak to specific grievances with her work.[1]

Turning to causation, Helfrich attributes her dismissal to Northwest's deliberate understaffing of the records department. That, combined with Miller and Neeley's purposeful elimination of older employees, she contends, demonstrates that Northwest intended for Helfrich to fail so that it could fire her too. Yet, accepting her characterization of a staffing shortage[2] for purposes of argument, Helfrich submits no evidence suggesting that Miller, Neeley, or anyone else at Northwest made personnel decisions on account of age. She identifies five other dismissed protected-class employees (i.e., over the age of 40), but reveals nothing about the circumstances of their departures indicative of age discrimination. Indeed, it appears that two of those employees (and perhaps a third) left voluntarily. (*See* R. 17-1, Helfrich Dep. at 8–18.) Helfrich emphasizes that, after her discharge, no protected-class employees remained in

---

[1]Helfrich argues that Miller admits that the emails constituted normal employee coaching and not complaints about her performance, but that overstates what Miller's deposition says. The relevant question did not address specific emails or complaints, and thus Miller's answer retracted none of the specific performance issues she and Neeley documented. (R. 25, Miller Dep. at 206.)

[2]Somewhat undermining her claim of an intentional staffing shortage in the records department, Helfrich admits that Northwest "hired various part-time employees around the time [she] completed her [30-day work-improvement plan]," whom she helped train. (Appellant Br. at 6.) These part-time employees "ultimately could not perform the job duties." (*Id.*)

Northwest's records, intake, or reception departments, but the deposition testimony she cites evinces nothing pernicious about this fact. Rather, it identifies six employees that remained in those departments at the time of Helfrich's termination, one of which may have been Laura Greer—one of Helfrich's exemplars of dismissed older employees. (R. 25, Miller Dep. at 213–15.) Northwest, on the other hand, relies on undisputed evidence that it hired more than 25 employees over the age of 40 since the beginning of 2011, and that a majority of the nine involuntary dismissals during that period were younger than 40. (R. 16-1, Miller Decl. ¶ 10.)

Helfrich asks us to disregard Miller's personnel data as self-serving, and attacks Neeley's veracity, citing a previous conviction. Yet, she has no evidence genuinely disputing Northwest's evidence. "Once the moving party [satisfies the summary-judgment burden of production], the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). Thus, at a minimum, Helfrich needed to present circumstantial evidence that Northwest treated older employees less favorably because of their age. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) ("[T]he plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."); *see also Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). Mere speculation will not do.[3]

---

[3]Helfrich contends that our decision in *Blizzard v. Marion Technical College* required the district court to credit her belief that Northwest forced out the five protected-class employees she relies upon. Not so. *Blizzard*, which nevertheless affirmed the dismissal of the plaintiff's ADEA claim, stated that the district court should have considered the plaintiff's testimony because "she did not 'merely offer her own opposing opinion of her qualifications, but challenged the factual basis of [her employer's] accusations." 698 F.3d 275, 286 (6th Cir. 2012) (citation omitted). Here, Helfrich proffers nothing but a vague "consensus" belief that one of the five dismissals

Next, Helfrich asserts that Northwest held younger employees to less exacting performance standards. She primarily focuses on her replacement,[4] Azaroff, whom Northwest transferred to the records department despite multiple performance problems as a receptionist. Yet, as the district court correctly observed, Helfrich's more than three-year tenure set her apart from Azaroff, who began working for Northwest in April 2011. Whereas Azaroff's performance issues occurred during her first five months on the job (which included a three-month probationary/trainee period) when she worked in a different department,[5] Helfrich's woes persisted into her fourth year of employment, even after receiving a 30-day warning. (*See* R. 25, Miller Dep. at 217 (explaining that Helfrich needed daily guidance that a three-year employee should not need).) Moreover, Helfrich fails to elaborate on the similarity of Azaroff's demerits to hers. Azaroff's transfer to the records department, without more, does nothing to undermine Northwest's performance-based rationale for firing Helfrich.

Nor do the two additional disparities Helfrich mentions in passing: (1) Northwest's transfer of a non-probationary employee in her twenties, Rachel Lucius; and (2) higher pay for younger employees. With regard to Lucius, Helfrich offers no detail regarding Lucius's performance issues and transfer between two different departments (billing and intake), other than Miller's general testimony that "there were concerns with the functions [Lucius] was doing in billing" that required "several" discussions. (R. 25, Miller Dep. at 91.) The dearth of

was "unfair," but she cannot explain why. (R. 17-1, Helfrich Dep. at 10.) Such unsubstantiated speculation does not support a reasonable inference of pretext for discrimination.

[4]Northwest disputes Helfrich's claim that Azaroff replaced her in the records department, arguing that the evidence shows Azaroff's transfer and assumption of some of Helfrich's duties. Because we agree that Helfrich fails to present evidence of pretext for age discrimination, we do not reach Northwest's alternative argument challenging her prima facie case.

[5]Helfrich does not suggest that Azaroff's performance problems continued following her transfer to the records department.

evidence precludes meaningful comparison between their disciplinary histories. So too with Helfrich's disparate pay allegation. She claims that Northwest paid Azaroff an hourly rate of $12, compared to her combined hourly rate of $11. (Appellant Br. at 21–22; R. 17-1, Helfrich Dep. at 51.) Meanwhile, the other younger employee she identifies, Andrew Thompson, received the same hourly rate she did. (R. 25-5, Miller Dep. Ex. S.) Assuming Azaroff's claimed rate for purposes of argument, this isolated pay differential, without additional context, does not reflect age discrimination.

Finally, Helfrich argues that her supervisors—and the district court—disregarded the ageist comments of a non-supervisory colleague, who called her "Mom." Neeley testified that the colleague "call[ed] everybody Mom," regardless of age. (R. 26, Neeley Dep. at 172–73.) Helfrich points to no evidence of management endorsing the comments. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620–21 (6th Cir. 2009) ("Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination."). The district court properly acknowledged that Helfrich reported these comments and found that they did not reflect age discrimination. *See Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 70 (1st Cir. 2002) ("[A]lleged use of the salutation 'Mom'—though no doubt insensitive, perhaps even rude—hardly constituted a self-sufficient foundation for an ADEA claim, especially since these particular attributions—motherhood and advanced age—plainly are not synonymous.").

III.

We AFFIRM.