NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0179n.06

No. 09-2193

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 25, 2011**
LEONARD GREEN, Clerk

PREM K. BHAMA,                                      )
                                                    )
    Plaintiff-Appellant,                            )          ON APPEAL FROM THE
                                                    )          UNITED STATES DISTRICT
        v.                                          )          COURT FOR THE EASTERN
                                                    )          DISTRICT OF MICHIGAN
MERCY MEMORIAL HOSPITAL CORPORATION,                )
                                                    )
    Defendant-Appellee.                             )
                                                    )

BEFORE:  MERRITT, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge.  Defendant Mercy Memorial Hospital declined to promote plaintiff Prem Bhama, an older male of Indian national origin, in favor of a younger, female, Caucasian applicant.  Mercy later terminated Bhama for allegedly engaging in unsanitary work practices and inappropriate patient care.  Bhama claims that Mercy's actions constituted discrimination on the basis of race, color, sex, national origin, and age, as well as unlawful retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.  Because Bhama cannot establish that Mercy's stated reasons for denying him promotions and for terminating him were pretext for unlawful retaliation, and for the alternative reason that Bhama has forfeited his new arguments on appeal, the district court correctly granted Mercy's motion for summary judgment and dismissed all Bhama's claims.

Bhama began working for Mercy on February 25, 2004 as a Nuclear Medicine Technologist in Mercy's Imaging Department.  Bhama is a sixty-eight-year-old male of South Asian Indian

descent. Bhama has bachelor's degrees in mechanical engineering and pre-medical science, has a medical degree, and is certified in nuclear medicine technology. Bhama's supervisor was Sridhar Iyengar, another male of Indian descent. Bhama worked in this position until September 30, 2008, when Mercy terminated him.

Mercy issued Bhama annual performance evaluations. According to Mercy's performance rating scale, a one rating means "meeting standards" and a two rating means "exceeds standards." On his first evaluation, dated June 28, 2004, Bhama received an overall rating of 2.03, as well as positive comments, such as the following: "[Bhama] is a very conscientious employee and I am impressed with his work ethic. The radiologists value his comments. Patients like his cheerful attitude and bedside manner," and "I have personally observed [Bhama] with patients and co-workers and can mirror [Iyengar's] comments on his compassion, professionalism and excellent bedside manner."

On January 28, 2005, Bhama received a written warning for his "[f]ailure to follow Departmental Protocol associated with the inappropriate mixing/diluting of Cholotec Kit radioisotope." On his second annual evaluation, dated March 28, 2005, Bhama received a lower overall rating of 1.83. Comments were mixed, including: "[E]stablished protocols must be followed even though changes may not be detrimental to the study. Must follow manufacturer's/Department guidelines," "Bedside manner commendable," "[A]pparel is sometimes out of dress code," and "Prem must strive to improve and increase communications with his fellow techs, increase dialogue and overall interactions so his actions are not misconstrued. Create and [sic] atmosphere where people can approach him more freely to avoid being misunderstood." The communication comment

referred to a co-worker who filed an EEOC complaint against Bhama. Bhama says he was exonerated of these charges and that this particular co-worker had a history of being abrasive, unapproachable, and difficult to work with.

Mercy began reorganizing in late 2005 by combining its Cardio Pulmonary Department with Bhama's Imaging Services Department. This involved hiring Cynthia Miller as Manager of Respiratory Care in January 2006. Miller was promoted twice, first to Manager of Cardio Pulmonary Services and then to Director of Cardio Pulmonary and Imaging Services. In early 2007, Miller reorganized the Imaging Services Department by splitting it into two groups—Special Imaging and Diagnostic Imaging. Accordingly, Miller created two new positions—Lead Nuclear Technologist and Special Imaging Manager. These positions required, among other things, a "good working knowledge of leadership and motivation techniques" and "excellent communication skills." The Lead Nuclear Technologist position also required a "good work record including attendance."

Bhama's third evaluation, dated February 27, 2006, rated him at 1.86. Comments were again mixed, including the same established-protocols, dress-code, and bedside-manner comments as before, "however, not all patients appreciate his comments and joking manner. He needs to use his judgment when interacting with patients as to whether or not they are going to be receptive to his comments and comments about a patient breaking the floor (should they fall) are NOT appropriate and should be totally avoided." The evaluation also noted that "Prem is a very conscientious employee and an asset to the Nuclear Medicine Department, and that he "needs to continue to keep the lines of communication open between himself and his supervisor and co-workers to avoid any potential misunderstandings or concerns as to what has been done or needs to be done."

3

Bhama claims that Miller later made two "third-world country" comments derogatory of his national origin. First, Miller reprimanded Bhama for using a broken IV stand affixed with a coat hanger to hold a patient's IV, stating that "respiratory therapy can do better than this and we have a 64-slice camera and it's not a Third World country." Second, at a department-wide meeting which Bhama did not attend, Miller commented on the difference between Mercy's new lobby and its old facilities, comparing the old facilities to a third-world country.

On February 28, 2007, Bhama received his fourth annual evaluation, which rated him still lower, at 1.06. Comments were generally positive though, such as, "Prem's rapport with patients is commendable. He has received care stars and appreciative letters from patients regarding his care," and "Very respectful of patients. Always addresses them as sir/madam." However, it was again noted that Bhama "needs to keep the lines of communication open between himself and coworkers to avoid potential misunderstandings," and to "[m]ake sure shirts and lab jackets are clean and neat." Bhama contends that Miller directed Iyengar to give Bhama lower marks on this evaluation. In his deposition, though, Iyengar testified that department practice both before and after Miller's hiring was for his supervisor to review his evaluations of employees such as Bhama and to then make changes to the evaluations if considered necessary.

Bhama interviewed for the Lead Nuclear Technologist and Special Imaging Manager positions on March 21, 2007. The interview panel consisted of Miller, a fifty-one-year-old white female, Dianna Redman, a forty-three-year-old white female, and Michael Vallejo, a twenty-eight-year-old Hispanic male. Bhama alleges that Vallejo asked Bhama how long he planned to work, and that Vallejo starred in his interview notes Bhama's response that he planned to work another five

4

years. Miller testified that Vallejo only asked questions from a prepared interview form, while Miller and Redman supplemented Vallejo's questions with unscripted technical questions; this interview form does not include a question about the length of time Bhama planned to work. Miller said that in her opinion, such a question would be illegal.

Following his interview, Bhama was rejected for both positions. Miller testified that while Bhama had qualifications for the positions, she was concerned that he had an inability to change and that he would not work well with her management style. Miller said she also considered her interactions with Bhama, including when she reprimanded him for using a coat hanger as an IV stand, in her promotion decision. Redman testified that the candidates' attitudes, communication skills, teamwork, and leadership abilities were discussed by the panel in reaching their decision. Redman said that Bhama's attitude—specifically, his inappropriate joking manner—was an issue, as was his lack of responsibility, poor communication abilities, and lack of a team effort. Redman also said she took into account her view that members of Bhama's department seemed disgruntled, as well as her knowledge of patient complaints regarding Bhama's department and of personality conflicts between Bhama and other employees. Vallejo could not remember specific performance issues with respect to Bhama, but mentioned that leadership and communication were differentiating factors among the candidates, and that Bhama's plan to work only five more years concerned him due to a fear that Bhama only wished to get promoted and then leave Mercy. Vallejo noted Bhama's short and unsure answers to interview questions. Also, Vallejo asked Bhama to give an example of a time when he went "above and beyond" what was expected in his position to provide customer service, but Bhama could not think of one.

The panel unanimously selected Erin Wesley for the Lead Nuclear Technologist position and Ray Palamatier for the Special Imaging Manager position. Wesley was a Caucasian female, and was thirty-nine years old at the time she received the position. Miller said Wesley was selected because she was enthusiastic, had a positive attitude, and appeared to work well with others. Miller also said that Wesley suggested creative ideas on how she could improve the Nuclear Medicine Department, and that Wesley had worked in competitors' nuclear medicine departments and thus had knowledge of their practices and procedures which she could implement at Mercy. While the panel was concerned that Wesley had a history of tardiness, Miller said Wesley provided a reasonable explanation for this, assuring the panel that it was not a chronic issue. All Lead Technologist positions were filled by Caucasian women, half of whom were under forty years of age.

Mercy's personnel policy states that "[t]he factors considered for promotion or transfer are the individual's prior work performance as indicated on the employee's performance evaluation forms, including attendance, job knowledge, quality and quantity of work, dependability and ability." Bhama claims that the interviewers disregarded this policy by ignoring the positive aspects of his performance evaluations and instead focusing on subjective characteristics—i.e., inability to work on a team, ineffective communication, and difficulty following protocols—that his evaluations contradicted. Furthermore, Bhama claims that he was far more qualified for the Lead Nuclear Technologist position than Wesley. Bhama states that he began his career as a nuclear medicine technician in 1977 and held a management position in a nuclear medicine department for approximately sixteen years. Wesley, by comparison, began her career in 1999, had never held a supervisory or management position, and had two associates' degrees.

6

Bhama filed an internal complaint on April 3, 2007 over Mercy's decision not to promote him to either of the two positions. Mercy held a hearing for Bhama's complaint on May 31, 2007, and then denied the complaint. Miller met with Bhama prior to this hearing on April 13, 2007, discussed his concerns over the interview process, denied his claims of discrimination, and said that the promotion decision would not be reversed. Bhama claims that Miller threatened him and Iyengar (who was also denied a promotion) on June 13, 2007, telling them that "[s]he didn't like my attitude and if you don't shut up I know how to handle you people." An employee log documenting this meeting states that Miller counseled Bhama and Iyengar on their "disruptive negative attitudes" in that "[t]hey talk negatively about the new leadership roles amongst other employees." The log also states that Miller stressed the need for confidentiality with the grievance process and told Bhama not to speak with other employees about grievance issues during hospital hours.

On June 25, 2007, Mercy's Human Resources Department received a letter from Redman stating that she had signed statements from Wesley and Mercy's student nurse, Mindy Speltier, regarding negative interactions they had had with Bhama. At the end of the letter, Redman wrote, "P.S. We may need them in the future!!" In Wesley's statements, she wrote that on April 23, 2007, she counseled Bhama on the need to use protocols and to do other work that is within his job description. According to Wesley, Bhama refused to do this other work, claimed that it was Wesley's job instead of his, and simply replied, "I'm not going to do it. I'm not in the right mind to do it." Wesley says she then explained to Bhama that refusing to do work that was well within his job description was insubordination. Wesley also wrote that on June 3, 2007, she counseled Bhama regarding the need to train another student nurse. Wesley wrote that Bhama "was not very

7

receptive to the idea stating 'She's different. She's not like John, she doesn't listen to me.' which is completely untrue." In her statement, Speltier complained of comments Bhama made to her on a daily basis, such as "I have to be nice to you or your mom may fire me," "does your mom give you allowance for your lunch?" (apparently referring to Wesley), and "If I am not nice to you, you may go and complain to Cindy about me." Speltier explained that she believed Bhama made these comments to make her feel as if she was being favored, since she often went to Wesley with her work-related questions.

On June 28, 2007, Bhama filed a Charge of Discrimination with the Michigan Department of Civil Rights alleging denial of promotion on the basis of age, sex, and/or national origin discrimination. On February 5, 2008, Bhama received his final annual evaluation. Bhama received a rating of 1.39, and again received negative comments about his compliance with Mercy's dress code.[1] Bhama filed suit in the district court below on April 11, 2008, claiming that his promotion denials constituted race, color, sex, and/or national origin discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a) and/or age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.

On July 29, 2008, while Bhama's federal lawsuit was ongoing, Redman recorded a patient's complaint about an interaction with Bhama that took place the previous day. While crying the whole time, this patient explained to Redman that she had gone to Mercy for an indium study on July 28, 2008. Bhama drew her blood, but ten minutes later, told the patient than they would need to reschedule because he did not have an isotope available to do the study. The patient questioned why

---

[1] Other comments on this evaluation are illegible.

8

Bhama had not checked this before drawing her blood. When she came back to Mercy on July 29, 2008 for the rescheduled indium study, Bhama allegedly drew her blood without wearing gloves or washing his hands. The patient "expressed to [Redman] that this last incident of not wearing gloves just made her an emotional wreck because she has an infection in her knee where she has had a total knee replacement and for him to put her at risk with not wearing gloves was just totally upsetting to her." She refused to allow Bhama to take any further part in her care or studies at Mercy.

On either July 29 or July 30, 2008, another patient complained about Bhama and Iyengar's behavior, including yelling and arguing when she arrived, that one of them was "asleep" during the procedure, and that the other had to bang on a window to wake him up. The patient said she felt there was no privacy or concern given her during her procedure, complained of the "circus environment" in Bhama's department, and said she would never go to Mercy again. On July 30, 2008, Mercy also received a phone call from a patient who complained that Bhama had given her an injection that day without wearing gloves. She also complained that Bhama "pushed things around in the room, touched many things and did not wash his hands before doing the injection."

On August 1, 2008, Redman counseled Bhama about the first two incidents and warned him that "[a]ny further inappropriate behavior or not having appropriate supplies or equipment needed to perform a study, which is careless or unsatisfactory work performance will result in a documented-discipline counseling session." Also that day, Redman signed a "Record of Documented Counseling" regarding Bhama's "Violations of the Rules of Conduct—[Bhama] did not wear gloves on two separate occasions involving drawing blood from a patient. This was discovered by patient complaints both times. This is a violation of the Rules of Conduct #7 which is a disregard of

9

common safety rules or policies specifically an Infection control violation." This record apparently refers to the first and third incidents. Bhama denied all the incidents and complained about harassing treatment from Wesley, that is, shouting at Bhama and saying that Miller wanted to terminate him.

On August 25, 2008, a co-worker complained that Bhama had used improper etiquette when speaking to a patient. "[Bhama] was witnessed approaching a patient and asking them whether or not he was treating them properly and this was viewed as a form of harassment." Bhama's written response was, "I think I know the co-worker who made this complaint. . . . This co-worker should worry more about the safety of the patients in her own department rather than worry about others." Another patient complained about Bhama on September 26, 2008. During the patient's computed tomography ("CT") and nuclear study, Bhama repeatedly stuck the same needle in her hand without finding a vein. Also, Bhama used the wrong size "angio-cath," causing the CT to restart the IV.

Finally, on September 25, 2008, Bhama received what would be his final patient complaint. A patient told Redman that the patient had gone to Bhama's department earlier that day for a procedure. According to the patient, Bhama started by being uncommunicative and unfriendly. Bhama then had the patient sit down next to a waste basket that was soaked with blood; the wall beside it was full of blood spatters. A blood-soaked cotton ball lay on the lab draw table next to the patient's chair. Bhama picked up the cotton ball with his bare hands and threw it in the waste basket, then proceeded to pick up and uncap the syringes he was going to use to inject the patient. The patient stormed out and refused further treatment, telling Redman that the patient would never come to Mercy again. Redman and another witness verified that the wall and the garbage can were blood-

spattered. Bhama denied that he treated the patient improperly and claimed that Mercy ignored his version of the event.

Following this incident, Mercy terminated Bhama on September 30, 2008. Mercy stated that it did so "in the interest of patient care . . . for continued violations of [Mercy] Work Rules and Employee Conduct Policy #302, regard for common safety and infections control rules as well as careless or unsatisfactory work performance that could result in harm to patients." Mercy further explained that "[Bhama's] performance with patient care is unacceptable and is not the quality of care that is required to continue to be employed at [Mercy]. Termination is warranted after past counseling has not improved this pattern of behavior." Bhama grieved his termination, but Mercy denied the grievance on November 25, 2008.

On February 19, 2009, Bhama amended his federal complaint to add an allegation that his termination was unlawful retaliation for his filing of an EEOC complaint against Mercy, in violation of 42 U.S.C. § 2000e, *et seq.* On March 12, 2009, Mercy moved for summary judgment on all Bhama's claims, which the district court granted on August 20, 2009 after ordering supplemental briefing on the issue of whether Mercy's stated reasons for denying Bhama promotions and for terminating him were pretext for discrimination. The district court held that Bhama had presented no direct evidence of age discrimination, but that he could establish a prima facie case of discrimination in the failure to promote claims, as well as retaliation in his termination claim. However, the district court then held that Bhama's claims failed because he could not demonstrate that Mercy's proffered reasons for denying him promotions and then terminating him were pretextual. Though Bhama argued that Mercy's reasons for denying him promotions were pretextual

11

because the reasons had no basis in fact, he produced no evidence disputing the factual basis of several of those reasons. Further, even for those reasons he did address, the district court concluded that Bhama "failed to meet his burden of establishing, by a preponderance of the evidence, that Defendant's proffered reasons are a pretext for illegal discrimination because they are without a basis in fact." As for Bhama's termination, the district court concluded that Bhama "provided no evidence to rebut Defendant's evidence that Plaintiff was terminated because his supervisors reasonably believed that he had violated Defendant's infection-control policies and procedures." Hence, Bhama "failed to show the presence of a genuine issue of material fact regarding Defendant's honest belief that Plaintiff violated Defendant's infection-control procedures," and therefore could not establish pretext. Bhama now appeals.

## I.      Discrimination/failure-to-promote claims.

The district court correctly dismissed Bhama's claims concerning Mercy's failure to promote him to the Lead Nuclear Technician or Imaging Services Manager positions, since Bhama cannot show a genuine issue of material fact on whether Mercy's proffered reasons for its decision were pretext for unlawful discrimination. For Bhama's discrimination claims to survive Mercy's motion for summary judgment, they must satisfy the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981). *See Spees v. James Marine, Inc.*, 617 F.3d 380, 389 (6th Cir. 2010). The first two steps of this framework—Bhama's prima facie case and Mercy's proffered non-retaliatory reasons for failing to promote Bhama—are not disputed on appeal. Under the third part of this framework, Bhama has the burden "to prove by a preponderance of the evidence that the

12

employer's proffered reason was in fact a pretext designed to mask illegal discrimination," *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000), and for summary judgment, that there is a genuine issue of material fact on this issue. Bhama challenges the district court's conclusion that his discrimination claims must fail because he cannot establish that Mercy's stated reasons for failing to promote him were pretext for unlawful discrimination.[2]

The district court found that Mercy offered eight facially legitimate, non-discriminatory reasons for choosing Wesley and Palmatier over Bhama in its promotion decisions, as follows: (1) Wesley "enthusiastically outlined her plans for improving the nuclear medicine department during her interview"; (2) Miller and Redman "believed that [Wesley] could bring innovative ideas to the Nuclear Medicine department"; (3) Palmatier "previously demonstrated that he could competently perform as the Special Imaging Manager"; (4) Bhama "had a documented history of ineffective communication"; (5) Bhama "received numerous complaints from colleagues and patients"; (6) Bhama "had difficulty getting along with Nuclear Medicine personnel"; (7) "Miller and Redman had personal knowledge regarding [Bhama's] ineffective communication and inability to work as a team"; and (8) Bhama "failed to reassure either [Miller or Redman] during his interview that he could improve his communication skills and become an effective manager." Bhama argued to the district court that these stated reasons were pretextual in that they had "no basis in fact." This "no

---

[2]Bhama faults the district court for requiring him to prove pretext on summary judgment, rather than merely presenting enough evidence to create a genuine issue of material fact. The district court's opinion could be read to state the wrong standard. However, as explained in the rest of this section, the district court's reasoning nonetheless supports its conclusion that Bhama's failure-to-promote claims should be dismissed. Moreover, this court reviews the matter *de novo* at this stage, and is therefore not bound by the district court's depiction of the standard of review anyway.

basis in fact" argument is one of three recognized methods of proving pretext, the other two being (1) the stated reasons were insufficient to motivate the decision, and (2) the stated reasons did not actually motivate the decision. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

As the district court correctly determined, though, Bhama failed to address several of these proffered reasons in his "no basis in fact" pretext argument. Bhama produced no evidence at all to undermine reasons (1), (2), and (3). Since Mercy offered reasons supporting its decision, "the burden of persuasion shifts back to [Bhama] to show that *each* proffered reason is merely a pretext for illegal discrimination." *Kestner v. Stanton Grp., Inc.*, 202 F. App'x 56, 60 (6th Cir. 2006) (emphasis added) (citing *Burdine*, 450 U.S. at 253). Because Bhama has not done this, his "no basis in fact" pretext argument must fail. Moreover, the district court also noted that while Bhama challenged his "ineffective communication" as a valid reason to deny him the promotions, his performance evaluations repeatedly commented on his need to improve communications. Such comments clearly refuted Bhama's argument with respect to Mercy's fourth reason.[3]

Bhama's sole pretext argument before the district court was that Mercy's reasons for denying him promotions had "no basis in fact." On appeal, Bhama relies on a different pretext argument—namely, that Mercy's stated reasons "did not actually motivate" its promotion decision. *See Manzer*, 29 F.3d at 1084. This is apparent from Bhama's statements at oral argument and from

---

[3]The district court did not address Bhama's responses to Mercy's "teamwork," "complaints," and "attitude" reasons for its decision (reasons (5) to (7) above). Because the rest of the district court's "no basis in fact" pretext analysis precludes Bhama's failure-to-promote claims, however, addressing these other responses was not necessary to the district court's disposition of the case.

the matters he cites on appeal. Rather than attempting to debunk each of Mercy's stated reasons for its promotion decision, as he would for a "no basis in fact" pretext argument, Bhama instead points to matters that bear no obvious relation to Mercy's stated reasons: (1) Miller's "third-world country" comments; (2) Miller's statement to Bhama and Iyengar that "she knows how to take care of people like you"; (3) Miller's supposed directive to Iyengar to give Bhama lower performance ratings; (4) Redman's having statements from Wesley and Speltier (with the "we may need them in the future!!!" post-script); and (5) Bhama's assertion that Mercy ignored both (a) his qualifications and (b) Wesley's attendance problem in reaching its decision. Since none of these matters addresses the factual basis of Mercy's stated reasons or illustrates how those reasons were not sufficient to motivate Mercy's decision, Bhama can only be citing them "to indict the credibility of [Mercy's] explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by [Mercy]"—i.e., that the stated reasons "did not actually motivate" the promotion decision. For a "did not actually motivate" theory of pretext, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal [or failure to promote]." *Manzer,* 29 F.3d at 1084. "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

Bhama's evidence does not establish a genuine issue of material fact on whether Mercy's stated reasons "did not actually motivate" its promotion decision. Regarding Miller's "third-world country" comments, the circumstances of the comments clearly show that Miller used this term to refer to what she considered the inadequate state of Mercy's equipment and facilities, not as a slur

15

towards Bhama or others of foreign descent. It would take a great deal of unwarranted speculation for a jury to infer a discriminatory animus from these two isolated comments. Another two of the instances Bhama cites—Miller's statement that "she knows how to take care of people like you" and Redman's "we may need them in the future!!!" note—occurred *after* Mercy already made its promotion decision and, according to Bhama, *in response to Bhama's grievance* of the promotion decision. If anything, these instances could plausibly support Bhama's termination claim,[4] but not his failure-to-promote claims. The two claims—termination and failure to promote—constitute distinct causes of action; evidence that may be relevant to one claim is not necessarily relevant to the other. As for Miller's supposed directive to Iyengar to "mark down" Bhama's evaluations, Iyengar testified that both Miller and Iyengar independently reviewed employee evaluations and made changes they deemed appropriate. Iyengar testified that Miller separately reviewed other employee evaluations (not just Bhama's), and that this separate level of review was the practice even before Miller was hired. The facts surrounding this departmentally-utilized evaluative practice, a practice which Miller did not even initiate, do not supply an inference of discriminatory animus on Miller's part.

All that is left is Bhama's conclusory allegation that Mercy ignored both his qualifications and Wesley's attendance issues in making its promotion decision. What the record shows, however, is that Mercy concluded that Bhama's actual or perceived negatives outweighed his actual or perceived positives with respect to the positions he applied for, making him less fit for the position. Correct or not, the law permits Mercy to do this with respect to Bhama and Wesley, particularly

---

[4]But even this is so only when the evidence is given a cursory review. As explained below, this evidence does not create a genuine issue of material fact for Bhama's termination claim.

16

where, as here, the applied-for positions' criteria emphasize a variety of factors for consideration, including "good working knowledge of leadership and motivation techniques," "excellent communication skills," and "good work record including attendance." The record reflects that Mercy considered both Wesley's actual and perceived positives and negatives—including her attendance issues—and concluded that her positives outweighed her negatives in a way that made her the best candidate for the position. While Bhama may honestly believe that Mercy made the wrong decision and that Mercy ignored relevant factors in doing so, a reasonable jury could not infer a discriminatory animus from this unsupported conjecture. In sum, the evidence upon which Bhama relies fails to raise a genuine issue of material fact as to whether Mercy's stated reasons for its promotion decision were pretextual in that they "did not actually motivate" the decision. Since Bhama cannot establish pretext, summary judgment was appropriate.

In any event, the court need not even consider Bhama's "did not actually motivate" pretext argument because he presented it for the first time on appeal; before the district court, Bhama relied solely on a "no basis in fact" pretext argument. Bhama could have argued this "did not actually motivate" pretext theory to the district court, but he did not.[5] Bhama has accordingly forfeited his new pretext argument. *See United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 758-59 (6th Cir. 1999); *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990).

---

[5]At oral argument, Bhama contended that the district court required him to establish pretext through the "no basis in fact" method, to the exclusion of all other methods. As Bhama conceded, though, this argument was never raised in his briefing. In any case, the language of the district court that Bhama says imposed this limitation does not do so on its face.

Bhama also argues that the district court should have determined that there was a genuine issue of material fact on whether Mercy denied him promotions, because he offered direct evidence of age discrimination. This evidence consisted of Vallejo's asking Bhama during the interview how long he planned to work, Vallejo starring in his notes Bhama's response that he planned to work another five years, and Miller's opinion that such a question would be illegal.

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). "It does not require the fact finder to draw any inferences to reach that conclusion." *Id.* As the district court pointed out, the evidence Bhama cites does not explicitly express any motivation to deny him promotions based on his age. Rather, one or more logical inferences are necessarily required to connect these comments to a discriminatory animus based on Bhama's age. This being the case, direct evidence does not raise a genuine issue of material fact with respect to Bhama's age-based failure-to-promote claims.

## II. Retaliation/termination claim

Similarly, the district court correctly dismissed Bhama's claim concerning his termination, because Bhama has not created a genuine issue of material fact as to whether Mercy's proffered reasons for his termination were pretext for unlawful retaliation. As with Bhama's failure-to-promote claims, the first two prongs of the *McDonnell Douglas* burden-shifting framework are not disputed on appeal for Bhama's termination claim. Rather, the only dispute centers on the district court's holding that Bhama cannot establish a genuine issue of material fact on whether Mercy's

stated reasons for terminating him were actually pretext—that Mercy actually terminated Bhama in retaliation for his grieving, and suing over, Mercy's promotion decision.

Mercy states that it terminated Bhama in response to repeated patient complaints throughout 2008 regarding Bhama's infection-control procedures and the unprofessional atmosphere in Bhama's department. In response, Bhama argued to the district court that the patients' complaints were inadmissible hearsay, and that because of this, Mercy was not entitled to rely on them to support its termination decision. This argument probably is most accurately characterized as a "no basis in fact" pretext argument, since Bhama's argument essentially is that Mercy's stated reasons lack any (admissible) evidentiary support. The district court rejected this argument. The district court explained that the evidence showed that Mercy had an "honest belief" in its stated reasons for terminating Bhama, because Mercy undeniably received and investigated the patient complaints before deciding to terminate him. Because Mercy had an "honest belief" that Bhama committed the acts complained of in the complaints, even if Bhama could show that the complaints were factually false, "Plaintiff has failed to show the presence of a genuine issue of material fact regarding Defendant's honest belief that Plaintiff violated Defendant's infection-control procedures." *Bhama v. Mercy Mem'l Hosp. Corp.*, No. 08-11560, 2009 WL 2595543, at \*15 (E.D. Mich. Aug. 20, 2009).

The district court's holding was legally correct. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728 (6th Cir. 2008) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). The evidence indisputably shows that Mercy

19

received several patient complaints regarding Bhama's infection-control procedures and professionalism in the months preceding his termination, including one stating that Bhama disposed of a blood-soaked cotton ball with his bare hands and immediately afterwards tried to administer an injection without washing up. Bhama never denied that Mercy received these complaints, he simply denied the truth of the allegations and dismissed them out of hand as inadmissible hearsay. Since Bhama advanced no evidence rebutting the idea that Mercy held an "honest belief" in the truth of these patient complaints, he could not establish pretext under a "no basis in fact" theory.

As was the case with his failure-to-promote claims, however, Bhama now appears to advance a "did not actually motivate" pretext argument with respect to his termination claim. This new pretext argument is apparent from his statements during oral argument, as well as from the nature of the sub-arguments on which he relies: (1) the decision-makers were predisposed to discriminate against Bhama and were aware of his promotion-decision grievances; (2) Bhama received no complaints before he filed his grievance; (3) the complaining patients were prejudiced against Bhama and Mercy did not let Bhama tell his side of the story; (4) the district court found that the patient complaints were true; (5) Mercy began to closely scrutinize Bhama only after he filed his grievance; and (6) Mercy wrote Bhama up despite promising not to and terminated him despite stating that further infractions would only result in a write-up. Only Bhama's third sub-argument even conceivably attacks the factual basis for the patients' complaints about him; all the remaining sub-arguments circumstantially address a retaliatory motive, unconnected to the patient complaints. "In other words, [Bhama] argues that the sheer weight of the circumstantial evidence of discrimination

20

makes it 'more likely than not' that [Mercy's] explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. This is the basis of a "did not actually motivate" pretext argument.

None of Bhama's six newly raised sub-arguments, however, establishes a genuine issue of material fact on whether the patient complaints "did not actually motivate" his termination: one of the sub-arguments is legally insufficient (no. 1), two are contradicted by the record (nos. 2 and 4), and the remaining three lack any support in the record (nos. 3, 5, and 6). Bhama's first sub-argument—that the decision-makers were predisposed to discriminate against Bhama and were aware of his promotion-decision grievances—apparently refers to some of the matters discussed earlier in the context of the failure-to-promote claims: to Miller's alleged "third-world country" comments, her alleged directive to Iyengar to mark down Bhama's evaluations, and her "I know how to handle you people" comment. The "third-world country" comments and evaluation directive, however, suffer from the same deficiencies with the termination claim as they do for the failure-to-promote claims. *See supra*. Also, Miller's "I know how to handle you people" comment originated nearly a year and three months before Mercy's termination decision, diminishing whatever substantive value the comment might have. *See, e.g., Gibson v. Shelly Co.*, 314 F. App'x 760, 773 (6th Cir. 2008) (noting that "in order to overcome a lack of temporal proximity, the plaintiff must present sufficient evidence supporting the causal connection"). Finally, the employer log documenting Miller and Bhama's meeting, in which she allegedly told him that if he did not "shut up" that she "kn[e]w how to deal with you people," states only that Miller counseled Bhama and Iyengar on talking negatively about the new leadership roles with other employees and that Miller cautioned Bhama to maintain confidentiality with the grievance process.

21

Bhama's remaining sub-arguments are no more indicative of pretext. The second sub-argument—that Bhama received no complaints before he filed his grievance—is not true. In 2005, Bhama received a written warning for his "[f]ailure to follow Departmental Protocol associated with the inappropriate mixing/diluting of Cholotec Kit radioisotope." Bhama's third sub-argument—that the complaining patients were prejudiced against Bhama and that Mercy did not let Bhama tell his side of the story—is not supported by the record. The mere fact that the final complaining patient identified Bhama by referring to his clothes' colors and his perceived foreign-born appearance shows only that the patient apparently did not know Bhama's name, not that he was prejudiced against Bhama and that his complaint was somehow untrustworthy. The record also shows that Mercy discussed the complaints with Bhama and counseled him about them, belying his claim that he was prevented from telling his side of the story. The fourth sub-argument—that the district court found the patient complaints to be true—is an incorrect reading of the district court's opinion. The district court never entered a finding about the truth of the patient complaints, it only held that Bhama presented no evidence challenging Mercy's "honest belief" in them. The fifth sub-argument—that Mercy began to scrutinize Bhama closely only after he filed his grievance—is simply unsupported speculation. Bhama's final sub-argument—that Mercy wrote him up despite promising not to and terminated him despite stating that further infractions would only result in a write-up—misstates the record, as the documentation on the patient complaints contains no such promises. It also ignores the fact that Mercy's employee handbook states that "depending on the severity of the violation the [previous disciplinary] steps are usually taken" and "based on the seriousness and nature of the offense disciplinary action may be initiated at any step."

In sum, a reasonable jury could not find that the multiple documented patient complaints regarding Bhama's serious breaches of infection-control procedures were pretext for unlawful retaliation. "A plaintiff must offer evidence sufficient to allow a reasonable juror to find that the employer was motivated by illegal reasons considering both the employer's stated reasons and evidence the employer offers in support of such reasons." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006). Moreover, "[a] defendant's proffered reason cannot be proved to be a pretext 'unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason.'" *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). That being the case, Bhama cannot establish a genuine issue of material fact on the issue of pretext, and his termination claim therefore fails.[6]

Finally, the cases cited by Bhama do not require reversal of the district court. In *DiCarlo v. Potter*, 358 F.3d 408, 415-18 (6th Cir. 2004), the plaintiff raised direct evidence of discriminatory animus on the part of an individual with decision-making authority. Bhama, in contrast, has raised no direct evidence. Moreover, the pretext issue, Bhama's main point of contention on appeal, was never reached in *DiCarlo*. *Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986), is distinguishable

---

[6]There is an alternative, independent basis for affirming summary judgment on the retaliation claim. Bhama's use of this new "did not actually motivate" pretext argument to advance his termination claim raises the same problem as with his failure-to-promote claims—he has forfeited the new pretext argument by failing to argue it to the district court. And even if Bhama's entire "did not actually motivate" pretext argument is not considered forfeited in full, since he at least argued *some* theory of pretext below, many of Bhama's sub-arguments for this new pretext theory were not presented to the district court at all, specifically, numbers (2), (3), (5), and (6). Even if Bhama should be allowed to restyle his evidence into a new theory of pretext on appeal, he still may not rely on wholly different evidence on appeal to support this theory, evidence that the district court never was directed to consider.

because Bhama, unlike the *Duchon* plaintiff, has not submitted an affidavit ignored by the district court, his evidence does not directly contradict Mercy's stated reasons for its promotion and termination decisions, and nothing Mercy stated itself raises an inference of discrimination. Bhama correctly quotes *Upshaw v. Ford Motor Co.*, 576 F.3d 576 (6th Cir. 2009), in that "[t]he judge's function . . . is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact." *Id.* at 592-93. However, the district court clearly applied the correct standard of review on Bhama's termination claim, and as for Bhama's failure-to-promote claims, the district court's reasoning and this court's *de novo* review support dismissal even if the district court misstated the standard of review.

The court therefore affirms the district court's judgment.

**HELENE N. WHITE, Circuit Judge** (concurring in part and dissenting in part). I join in the affirmance of the district court's dismissal of Bhama's termination claim.

I respectfully dissent as to the failure-to-promote claim, because I conclude that Bhama presented sufficient evidence to raise a genuine issue of material fact regarding whether Mercy's stated reasons were pretextual.

In this regard, I do not agree that Bhama forfeited the argument that Mercy's stated reasons for not promoting him were not the real reasons, i.e., that they did not actually motivate Mercy's denial of promotion. Bhama advanced both grounds for his pretext argument in the district court: that the purported reasons Mercy relied on in not promoting him were not true, i.e., had no basis in fact, and that Mercy's articulated reasons were not the real reasons he was denied promotion, i.e., did not actually motivate Mercy's failure to promote Bhama.[1]

Further, I do not agree that Bhama's burden of persuasion once Mercy offered reasons supporting its decisions not to promote him was to show that *each* proffered reason Mercy advanced was pretextual. Where, as here, a defendant does not argue that each reason it articulated would have independently resulted in the adverse employment action, a plaintiff need only show that some of the reasons are pretextual. *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006).

Bhama presented evidence below that at the time Mercy denied him promotions in March 2007, he did not have a documented history of ineffective communication, he had not received the

---

[1]Bhama's response to Mercy's motion for summary judgment argued, *inter alia*, that "[t]he reasons advanced by Defendant for denying Plaintiff his promotions are not true and/or were not considered when denying Plaintiff the subject promotions," and that "Defendant's purported reasons for Plaintiff's promotion denials are simply not true and were not, in fact, considered in denying Plaintiff those promotions." R. 32 at 16.

cited numerous complaints from colleagues and patients, and had not had difficulty getting along with Nuclear Medicine personnel. Bhama's 2004 evaluation rated him as 2.03, a superlative score given that 2.0 is the highest possible rating and represents "exceeds standards." His 2005 evaluation, dated February 27, 2006, rated him as 2.0 in the Customer Service/Teamwork category, which included a 2.0 rating for "Displays an attitude of teamwork and respect for the hospital as a whole, with supervisor and with fellow employees." It was only in the evaluation dated February 28, 2007, shortly before Bhama interviewed for promotion on March 21, 2007, that his overall rating dropped significantly – to 1.06.[2] This evaluation stated:

> Very respectful of patients. Always addresses them as sir/madam. Prem needs to keep the lines of communication open between himself and supervisor and coworkers to avoid potential misunderstandings. . . .

In sum, Bhama's performance evaluations do not support three of the reasons Mercy advanced in the district court for denying him promotion: that he had a documented history of ineffective communication; received numerous complaints from colleagues and patients; and had difficulty getting along with Nuclear Medicine personnel.

I note that Bhama also argued in response to Mercy's summary judgment motion that the reasons Miller gave on deposition for not promoting him are not the reasons Mercy argued in the

---

[2]During her deposition, Miller testified that after she assumed a management role at the hospital, she recalibrated the assignment of performance ratings to employees in her department. Under the rating system, employees are evaluated on a 0-2 scale, where 0 means "does not meet standard," 1 means "meets standard," and 2 means "exceeds standard." Prior to Miller's tenure, employees were routinely given twos for satisfactory work. As Miller saw it, "[a] two [should be reserved for] if you go way above and beyond that job expectation . . . ." R. 26 at 19. As a result, "some individuals who had two's all the time were now getting one's because their level of performance was what their job description and their expectation level was." *Id.* at 20. Thus, Bhama's overall rating of 1.06, while significantly lower than his previous ratings, still fell above "meets standard" and signified satisfactory performance under Miller's system.

district court. R. 32 at 17-18. On deposition, Miller testified that she believed Bhama was qualified for the Lead Tech position, that he had prior experience in that arena, but that she had concerns regarding Bhama based on observations in previous encounters that he had an "inability to change," and that she was looking at how well they could work together. Miller dep. 25-27. When asked what she meant by "inability to change," Miller responded, "Policies, procedures, maybe processes in the department that we need to, you know, move forward with. I, you know, just didn't think his ability to change with my management maybe experience was similar . . ." *Id.* at 26. She answered "no" when asked if she had additional concerns about Bhama.

In the district court, Mercy argued that:

Cindy Miller's and Dianna Redman's reasons for choosing Erin Wesley and Ray Palmatier instead of Plaintiff are undisputed: (1) Erin enthusiastically outlined her plans for improving the nuclear medicine department during her interview; (2) Cindy Miller and Dianna Redman believed Erin could bring innovative ideas to the Nuclear Medicine Department; (3) Ray Palmatier previously demonstrated that he could perform as the Special Imaging Manager; (4) Plaintiff had a documented history of ineffective communication; (5) Plaintiff received numerous complaints from colleagues and patients; (6) Plaintiff had difficulty getting along with Nuclear Medicine personnel; (7) Miller and Redman had personal knowledge regarding Plaintiff's ineffective communication and inability to work as a team; and (8) Plaintiff failed to reassure either Cindy Miller or Dianna Redman during his interview that he could improve his communication skills and become an effective manager.[3]

That an employer changes rationale for making an adverse employment decision can be evidence of pretext. *Asmo*, 471 F.3d at 596; *Cicero v. Borg-Wagner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). "While the Court does not question business decisions, the Court does question a

---

[3]Def.'s Summ. J. Mot., R. 17 at 18-19.

27

defendant's proffered justification when it shifts over time. When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendant's decision." *Cicero*, 280 F.3d at 592. It is for a jury to decide whether these varying articulations of Mercy's rationale for not promoting Bhama are sufficient to demonstrate pretext. In sum, because I conclude that a reasonable jury could infer from the evidence, when viewed in a light most favorable to Bhama, that some of Mercy's reasons for not promoting him were pretextual, I would reverse the dismissal of Bhama's failure to promote claims.